## JONES v. BEAVER NAT. BANK.

(Supreme Court, Appellate Division, First Department. April 4, 1912.)

1. BANKS AND BANKING (§ 243*)—INSOLVENCY AND DISSOLUTION—DISTRIBU-
TION OF SURPLUS.

Plaintiff agreed to purchase 90 shares of stock in a new bank, and to pay therefor the par value, plus 50 per cent. for a surplus and 5 per cent. for expenses of organization. The bank sent him two certificates of stock—one for 45 shares and the other for 90 shares—assigned in blank, which had originally been issued to others, and on which only par had been paid, but of which no transfer was made on the books of the company. Upon plaintiff's refusal to accept the shares, the bank's vice president, who had obtained plaintiff's subscription, promised to issue a fully paid certificate for the 90 shares. A resolution of the board of directors, later made, provided that no certificates "not wholly paid as to capital and surplus" should be transferred on the books of the company. Section 12, National Banking Act (Act June 3, 1864, c. 106, 13 Stat. 102; Rev. St. § 5139 [U. S. Comp. St. 1901, p. 3461]), provides that capital stock shall be "transferrable on the books of the association in such manner as may be prescribed in the by-laws and articles of association," and that every person becoming a shareholder "by such transfer" shall succeed to all the rights and liabilities of the prior holder. *Held,* that a transfer on the books was necessary to make plaintiff a shareholder, and that the mere retention of physical possession of the shares pending performance by the defendant of the agreement made would not subject him to any liability for the unpaid amount for surplus and organization on those shares.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 904–908; Dec. Dig. § 243.*]

2. BANKS AND BANKING (§ 288*)—INSOLVENCY AND DISSOLUTION—DISTRIBU-
TION OF SURPLUS—RIGHTS OF SHAREHOLDER.

And the fact that the plaintiff temporarily consented to hold the shares with a knowledge that the defendant was going to make a false report to the Comptroller of the Treasury, based thereon, would not preclude him from recovering the amount of a return dividend on capital, declared in voluntary liquidation on the stock which should have been issued to him.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1105–1110, 1114–1127; Dec. Dig. § 288.*]

McLaughlin, J., dissenting.

Appeal from Trial Term, New York County.

Action by John B. Jones against the Beaver National Bank. From a judgment for plaintiff on a directed verdict, he appeals. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

Manton M. Wyvell, for appellant.
Saul J. Baron, for respondent.

MILLER, J. [1] The plaintiff, claiming to be the owner of 90 shares of the defendant's stock, sued to recover 60 per cent. of the par value thereof, the amount of dividends representing returned capital, declared by the liquidating committee. For answer the defendant denied that it had knowledge or information sufficient to form a belief as to whether the plaintiff was the owner and holder of 90

shares of its capital stock,. and for a counterclaim alleged that the shares held by the plaintiff were 90 shares of an issue of 230 shares, made to one S. A. McCartney, upon which he agreed to pay $155 a share, but had in fact paid only $100 per share, leaving due and unpaid $55 per share. The court directed a verdict for the plaintiff for the difference between the amount of the dividend on 90 shares and the amount claimed to have been unpaid on 90 shares of the stock issued to the said McCartney. The plaintiff testified, and it is not denied, that he made an agreement with one Welsh, representing the defendant, to subscribe for 90 shares of the defendant's capital stock, and to pay therefor the sum of $155 per share, $100 for capital, $50 for surplus, and $5 for organization expenses. Welsh was the defendant's vice president, and it is undisputed that he was employed by it to procure subscriptions for its capital stock. Pursuant to that agreement, on May 1, 1907, the plaintiff made and delivered to said Welsh his promissory note for $13,950, secured by collateral. That note was discounted by the defendant, and the proceeds passed to the credit of Welsh. On May 3, 1907, the defendant issued two certificates of stock, one for 45 shares to C. P. Shinn, and one for 90 shares to S. A. McCartney. It received par for those shares, or $13,950, the amount which the plaintiff had agreed to pay for 90 shares. On the face of each certificate was indorsed in red ink: "One hundred dollars per share paid on this certificate." While there is no direct testimony to the effect, it is plainly to be inferred that the proceeds of the plaintiff's note were used to pay par on said 135 shares. The two certificates for 90 and 45 shares, respectively, assigned in blank by Shinn and McCartney, were mailed to the plaintiff by Welsh. The plaintiff immediately wrote Welsh, calling the latter's attention to the fact that he had agreed to purchase only 90 shares and refusing to accept the said certificates or to become responsible for the sums unpaid. He testified that Welsh replied, in substance, that a report to the Comptroller of the Currency was due; that the certificates had been made out in the manner stated for the purpose of making a showing to the Comptroller; that he would soon cause 45 shares to be sold, and would then have a certificate issued to the plaintiff for 90 fully paid shares. The plaintiff further testified that he subsequently presented the said two certificates at the banking office of the defendant, and asked that a certificate be issued for his shares, and that Welsh put him off by saying that there had been some delinquent subscribers, that the president of the defendant was away, and that he would see that it was arranged. The shares represented by the certificates delivered to the plaintiff were never transferred to him on the books of the defendant, and on October 30th a resolution of the board of directors was adopted providing that no certificates "not wholly paid as to capital and surplus" should be transferred upon the books until fully paid. On the 14th of January, 1908, the defendant's stockholders adopted a resolution for its voluntary liquidation.

Even if the 135 shares issued to McCartney and Shinn had actually been transferred to the plaintiff, no question of statutory liability would be involved, because the full par value had been paid upon them. No question as to the rights of creditors is involved, because

there are no creditors unprovided for. The question really is whether the defendant can recover of the plaintiff the amount unpaid on McCartney's subscription, on the theory that the plaintiff as transferee of McCartney succeeded to the latter's liability. But the plaintiff refused to accept the transfer of the shares issued to McCartney, and the defendant by the resolution of its board of directors refused to accept the plaintiff as transferee. Section 12, National Banking Act (Revised Statutes, U. S. § 5139 [U. S. Comp. St. 1901, p. 3461]), provides:

"The capital stock of each association shall be divided into shares of one hundred dollars each, and be deemed personal property, and transferrable on the books of the association in such manner as may be prescribed in the by-laws or articles of association. Every person becoming a shareholder by such transfer shall, in proportion to his shares, succeed to all the rights and liabilities of the prior holder of such shares; and no change shall be made in the articles of association by which the rights, remedies or security of the existing creditors of the association shall be impaired."

Obviously the words "such transfer" refer to a transfer on the books of the association, and the cases dealing with the devolution of the statutory liability of the original subscriber upon a transferee recognize the principle that privity between the transferee and the corporation must be shown. See Webster v. Upton, 91 U. S. 66, 23 L. Ed. 384; Richmond v. Irons, 121 U. S. 27, 7 Sup. Ct. 788, 30 L. Ed. 864.

But, as I have said, there is no question in this case of statutory liability. The defendant can only recover upon contract, express or implied. Seymour v. Sturgess, 26 N. Y. 134; Christensen v. Eno, 106 N. Y. 97, 12 N. E. 648, 60 Am. Rep. 429; Glenn v. Garth, 133 N. Y. 18, 30 N. E. 649, 31 N. E. 344. We may assume, without deciding, that if the plaintiff had agreed to accept a transfer of the shares represented by the certificates delivered to him, knowing that $55 per share of the subscription price had not been paid, and if the defendant had accepted him as a transferee, the law would imply a promise on his part to pay the sum unpaid. But neither of these conditions existed in this case, and there can be no pretense that any promise was ever made by the plaintiff to the defendant except to pay $13,950 on an original subscription for 90 shares of stock. The plaintiff performed his part of the contract. The defendant never performed its part, although the plaintiff frequently demanded that it do so. I know of no principle of law by which the party in default can recover of the one who has fully performed upon a liability of a third party which the party performing never expressly or by implication assumed.

[2] It is wholly immaterial in this case whether the defendant made a false report to the Comptroller. It may be inferred that Shinn and McCartney had subscribed for stock which they were unable to pay for, and that, to make as good a showing as possible of stock issued upon which par had been paid, the defendant for its own purposes, used the plaintiff's money to justify what was in fact only a fictitious issue to Shinn and McCartney. There is no question here of Welsh's authority to do that, the defendant received the plaintiff's

money, and whatever benefit was derived from that transaction. Possibly the plaintiff winked at the deception practiced upon the Comptroller; but there is no such question involved in this case, and there are not sufficient facts in the record to determine it. If a wrong was done, it is not to be redressed in this action. We are concerned only with the plaintiff's contract to subscribe and pay for 90 shares. He paid, and the defendant received, the full sum agreed upon, and the plaintiff is either entitled to the return of his money or to his rights under the contract. The delivery to him of certificates issued to other parties for more shares than he agreed to buy, not fully paid upon, was not a performance by the defendant of its contract to deliver a certificate for ninety full paid shares, and, according to the plaintiff's testimony, that was not intended by the defendant or accepted by him as such. He never became, nor consented to become, a transferee of those shares, and the defendant never recognized him as such. He merely held two certificates for 135 shares, assigned in blank by the original holders, pending the performance by the defendant of its contract. He tendered the certificates delivered to him, and demanded the one to which he was entitled under his contract. By retaining physical possession of them pending the performance by the defendant of its promise to comply with that demand, he did not subject himself to any liability, express or implied, contract or otherwise, upon which the defendant can maintain an action against him.

Of course, the defendant is entitled to the return of the two certificates which it delivered to the plaintiff, but he has tendered those certificates to it and never up to the commencement of this action, or in his complaint, asserted any right to either of them. According to the only contract ever made by him with the defendant, he is entitled to share with the other stockholders in the distribution of its capital upon the basis of being a holder of ninety fully paid shares. That is the only right which he is asserting in this action. It was therefore error for the court to direct judgment upon the defendant's counterclaim, and the judgment should be reversed and a new trial granted, with costs to appellant to abide the event.

INGRAHAM, P. J., and LAUGHLIN and DOWLING, JJ., concur.

McLAUGHLIN, J. (dissenting). At the conclusion of the trial the conceded or undisputed facts did not justify a recovery by the plaintiff of the dividend sought to be recovered on the theory that he was the owner and holder of 90 fully paid shares of defendant's stock. The plaintiff was vice president of the defendant and chairman of its board of directors. One Welsh was also a vice president, and had authority to sell stock for the bank for the sum of $155 per share, $100 for par value, $50 for surplus, and $5 for organization expenses. The plaintiff knew Welsh had this authority, and he also knew that the bank would not issue any fully paid stock except at $155 per share. Prior to May 1, 1907, he had purchased 10 shares, for which he had paid that price. On the 1st of May, 1907, Welsh went to

the plaintiff for the purpose of inducing him to purchase 200 additional shares. This the plaintiff declined to do, but finally agreed to purchase 90 additional shares, providing he could pay for the same by giving Welsh personally his promissory note. This Welsh agreed to and thereupon plaintiff gave to him his promissory note, dated May 1, 1907, for $13,950, payable four months thereafter. The note was discounted by the defendant, and the proceeds, less the discount, placed to the credit of Welsh's personal account, and he subsequently used the same, but for what purpose does not appear. On the 5th or 6th of May, 1907, he mailed to the plaintiff two certificates of stock, one for 90 shares issued to one McCartney and one for 45 shares issued to one Shinn, both indorsed in blank. On the face of each certificate was indorsed in red ink, "$100 per share paid on this certificate;" and the plaintiff testified that he knew only $100 per share had been paid, and there still remained due $55 per share. Upon receipt of them, he wrote Welsh, acknowledging their receipt, calling attention to the fact that only $100 per share had been paid, and that he had only agreed to purchase 90 shares, which were to be fully paid, and asking why 135 shares had been sent to him with only $100 per share paid. He also stated that he did not wish to hold the certificates, would not become responsible for the unpaid portion of the subscription price, and asking if he should return them to the president of the bank. A few days later Welsh saw the plaintiff, and then stated that he had sent the 135 shares, so that a report could be made to the Comptroller of the Currency and asked that plaintiff hold the same for a short time, and he would, in the meantime, sell 45 shares, when he would have a certificate for 90 fully paid shares issued to him. Plaintiff acquiesced in this arrangement, and nothing further was done by him until some time in July following, when he took the certificates to Welsh, and asked him to have a certificate for 90 fully paid shares issued in place thereof. This interview, it is true, took place at the bank, but, so far as appears, it was not participated in by anybody but Welsh, nor did it result in anything, plaintiff testifying that Welsh put him off, saying that the president of the bank was out of town and on his return he would have the matter attended to. Plaintiff thereafter did not offer to return the two certificates, nor did he make any further claim that he was entitled to have issued to him in place of them a certificate for 90 fully paid shares, until nearly three years later, when he commenced this action.

On the 30th of October, 1907, at a meeting of the board of directors of the bank, at which he presided, the following resolution was passed:

"Resolved, that all persons holding certificates of stock in the Beaver National Bank, which are not fully paid as to capital and surplus, be notified that their certificate must be surrendered, in exchange for which interim receipts will be issued for the amount actually paid; and further, that notice be given that the unpaid surplus must be paid in within thirty days; and further that certificates which are now outstanding and not wholly paid as to capital and surplus will not be transferred upon the books of this institution until fully paid."

The plaintiff testified that he knew when the resolution was passed that it referred to the certificates for 135 shares held by him, and that

only $100 a share had been paid on the stock represented by such certificates. He did not object to the passage of the resolution, nor did he make any claim that he was entitled to have a certificate for 90 shares fully paid issued in place of those which he held, or that he was not liable thereon for $55 per share; nor did he thereafter make any such claim until he commenced this action. When the resolution was passed, he was obviously willing to be treated as the owner and holder of certificates for 135 shares, and continued in the same frame of mind until after the bank had passed into voluntary liquidation, and some two years later a dividend of $60 per share was declared on the fully paid stock. Then, for the first time after the interview with Welsh in 1907, he discovered that it would be for his interest to make the claim which he now does. Having thus held the certificates he ought to be treated as the owner of them and liable for the unpaid subscription, certainly in so far as he asserts a claim based on them for the dividend declared.

The prevailing opinion proceeds upon the theory that he is entitled to the dividend declared on the McCartney stock—90 shares—but is not liable to the bank for the unpaid subscription thereon, and this is upon the theory that the proceeds of the plaintiff's note given to Welsh "were used to pay par on said 135 shares." It is conceded there is no direct testimony to this effect, but it is urged such fact is to be inferred. There is not only no testimony to that effect, but all of the evidence bearing on the subject is directly to the contrary and that there is not more evidence on that subject is due to the objections of plaintiff's counsel.

The action is predicated upon certificate No. 98; that is, the one issued to McCartney for 90 shares. The president of the bank testified that certificate No. 98 was issued to McCartney; that no one was present but McCartney when it was delivered to him; and that he paid $100 per share thereon. Defendant sought to show the entire transaction connected with the payment by McCartney and the delivery of the certificate to him, but its efforts were unavailing; plaintiff's objections to the introduction of evidence bearing on that subject being sustained by the court. Under such circumstances, it cannot "be inferred that the proceeds of the plaintiff's note were used to pay par on said 135 shares," to say nothing of the uncontradicted testimony of the president of the bank that the proceeds were credited to Welsh's personal account and thereafter used by him.

It is true Welsh had authority, as already indicated, to sell stock for the bank at $155. That authority was to sell for cash. He had no authority to sell stock and take in payment a promissory note, payable four months later, to his own order. Nor did he have authority to agree with the plaintiff that, if he would hold the 135 shares for a short time, he would sell 45 of them, and then have 90 fully paid shares issued to the plaintiff. The plaintiff's loss, therefore, is not due to the breach of any agreement with the bank, but to the agreement made with Welsh, to whom he must look for his damage. The truth is that, after the interview with Welsh in 1907, plaintiff was perfectly willing to be treated as the owner and holder of the 135 shares so long as there was any prospect of the stock increasing in value. It was not until after it appeared there would be a loss upon the

stock that he claimed to the contrary. His claim was obviously made for the sole purpose of escaping the payment of the balance due, and getting the dividend declared without any deduction therefrom. The trial court held that he was entitled to the dividend declared on the certificate for 90 shares, but there must be deducted therefrom $55 per share, the unpaid subscription, and directed a verdict for the difference. This was fair to the plaintiff and fair to the other stockholders.

For these reasons, I dissent from the opinion of Mr. Justice MILLER, and vote for an affirmance.